# Exhibit 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** ) | |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) | **MDL No. 2804** |
| ) | |
| ***Cherokee Nation v. McKesson Corporation et al.,*** ) | **Case No. 17-md-2804** |
| **Case No. 1:18-OP-45695** ) | **Judge Dan Aaron Polster** |
| ) | |
| ***Lac Courte Oreilles Band Of Lake Superior Chippewa Indians v. McKesson Corporation et al,*** ) | **OPINION AND ORDER** |
| **Case No. 1:18-OP-45932** ) | |

Before the Court are Plaintiffs' Cherokee Nation ("Cherokee") and Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Lac Courte Oreilles") (collectively "the Tribes") Motions to Remand. **(1:18-OP-45695 Doc #: 12; 1:18-OP-45932 Doc #: 15)** The Court has reviewed the Motions, the Opposition Briefs, and the Reply Briefs of both cases and for the reasons to follow, **DENIES** both the Cherokee and the Lac Courte Oreilles Motions to Remand.

Additionally, for the reasons set forth below, Defendant McKesson Corporation's ("McKesson") Motion to Stay Execution of Any Remand Order pending in Case no. 1:18-OP-45695 (Doc #: 72) and Cherokee's Motion for Oral Argument pending in the same case (1:18-OP-45695 Doc #: 73) are also **DENIED**.

## I.     Introduction

In this Multidistrict Litigation ("MDL"), Plaintiffs are government entities, Indian tribes, hospitals, third-party payors and individuals from across the nation that have sued the

manufacturers, distributors and retailers of prescription opiate drugs, alleging they are liable for the costs Plaintiffs have incurred, and will continue to incur, in addressing the opioid public health crisis. There are now over 1150 cases in the MDL—53 of which were filed by Indian tribes.

### A. Procedural History re: *Cherokee Nation v. McKesson Corporation et al.*, Case No. 1:18-OP-45695

On April 20, 2017, Cherokee filed a petition in the District Court of the Cherokee Nation against defendant opioid distributors and pharmacies. (*See* 1:18-OP-45695 Doc #: 12 at 3) The defendants, in turn, filed a declaratory judgment action in the District Court for the Northern District of Oklahoma on June 8, 2017 seeking to enjoin the tribal lawsuit. (*See Id.*) The Federal District Court granted defendants' motion for preliminary injunction on January 9, 2018. (*See Id.*)

Ten days later, on January 19, 2018, Cherokee filed this action in the District Court of Sequoyah County, Oklahoma. (1:18-OP-45695 Doc #: 2-1) Cherokee asserted solely state common law claims related to alleged actions and omissions of McKesson Corporation et al. that allowed opioid diversion to occur in the counties of Cherokee Nation in northeastern Oklahoma. On February 26, 2018 Defendant McKesson removed the case to the United States District Court for the Eastern District of Oklahoma alleging as its grounds for removal the Federal Officer Removal Statute, 28 U.S.C. § 1442. (1:18-OP-45695 Doc #: 2 at 2) McKesson subsequently filed a Notice of Potential Tag-Along Action relating to the present National Prescription Opiate MDL whereon the case was transferred to the Northern District of Ohio. (*See* 1:18-OP-45695 Doc #: 12 at 4; *see also* Doc #: 69)

### B. Procedural History re: *Lac Courte Oreilles Band Of Lake Superior Chippewa Indians v. McKesson Corporation et al*, Case No. 1:18-OP-45932

Similarly, on March 16, 2018, Lac Courte Oreilles filed a Complaint in the Circuit Court of Sawyer County, Wisconsin against defendant opioid manufacturers, distributors, and pharmacies. (1:18-OP-45932 Doc #: 1-1 at 26-95) Lac Courte Oreilles similarly asserted only state

law claims. On April 19, 2018 McKesson removed the case to the United States District Court for the Western District of Wisconsin—again alleging as its grounds for removal the Federal Officer Removal Statute. (1:18-OP-45932 Doc #: 1 at 3) Here, Defendant Cardinal Health, Inc. filed a Notice of Potential Tag-Along Action relating to the present National Prescription Opiate MDL whereon the case was transferred to the Northern District of Ohio. (*See* 1:18-OP-45932 Doc #: 15 at 4; *see also* Doc #: 27)

## II.    Standard of Review

When a case is removed under the Federal Officer Removal Statute, the Court is free to use its own circuit's interpretation of the federal law to form its opinion. *See In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1186 (D.C. Cir. 1987) ("Nothing in the Supreme Court's opinion in *Van Dusen* nor in the language of section 1407(a) requires a federal court to engage in the unprecedented practice of interpreting federal law through the analytical prism of another circuit's case law.").Therefore, in deciding the present motions, the Court will apply Sixth Circuit case law to its analysis of the Federal Officer Removal Statute.

Title 28, Section 1442 of the U.S. Code permits the removal of a "civil action or criminal prosecution that is commenced in a State court and that is against or directed to . . . any officer (or any person acting under that officer) of the United States . . . in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442.[1] The Supreme Court has "made clear that the [Federal Officer Removal] Statute must be 'liberally construed.' *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932); also citing *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) and *Willingham v.*

---

[1] In 1996, congress added the parenthetical "(or any person acting under that officer)" to broaden the scope of the Federal Officer Removal Statute. See *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 390 (6th Cir. 2007).

*Morgan*, 395 U.S. 402, 406–407 (1969)). The Federal Officer Removal Statute is unique in that it provides a right to appeal where a case removed under 28 U.S.C. § 1442 is subsequently remanded. *See* 28 U.S.C. § 1447(d). Although a liberal construction has limits, *see Watson*, 551 U.S. at 147, the Supreme Court's "policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of 28 U.S.C. § 1442(a)(1).'" *Manypenny*, 451 U.S. at 242 (internal citation omitted). While some circuits have taken a more narrow view of removal under the Federal Officer Removal Statute, the Sixth Circuit has endorsed "the broad scope of the federal officer removal statute," and thus this Court interprets the statute broadly in favor of removal in this instance.[2,3] *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 (6th Cir. 2010).

The purpose of federal officer removal jurisdiction is to ensure that federal officers can raise colorable federal defenses arising out of their duty to enforce federal law and are given the impartiality of a federal forum. *See Bennett*, 607 F.3d at 1085 (citing *Willingham*, 395 U.S.at 406-07). Federal officer removal requires a private corporate defendant to show that (1) it is a person who acted under the direction of a federal officer; (2) the actions for which it is being sued were performed under the color of federal office, and (3) there is a colorable federal defense to the plaintiff's claims. *See Id.*

---

[2] The Court notes that while federal officer removal jurisdiction pursuant to 28 U.S.C. § 1442, is entitled to a liberal construction in favor of removal, federal question jurisdiction pursuant to 28 U.S.C. § 1331 should be strictly construed against removal. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941); *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).

[3] *Compare Bennett*, 607 F.3d at 1084 (6th Cir. 2010) ("In *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969), the United States Supreme Court explained the broad scope of the federal officer removal statute"; *with Gragg v. Alfa Laval, Inc.*, No. CIV. 09-773-GPM, 2009 WL 4110389, at *4 (S.D. Ill. Nov. 20, 2009) ("although [federal officer removal] jurisdiction is read 'expansively' in suits involving federal officials, it is read narrowly where, as in this instance, only the liability of a private company purportedly acting at the direction of a federal officer is at issue.").

## III.   Analysis

### A.   Acting Under

A private corporate defendant can show that it acted under the direction of a federal officer in situations where "the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. For example, private contractors have been found to be acting under the direction of a federal officer when the contractor "is helping the Government to produce an item that it needs, [and] in the absence of a contract with a private firm, the Government itself would have had to perform [the contracted job]." *Id.* at 154 (citing as an example *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange)). Therefore, while mere compliance with a government regulation, even a strict one, is insufficient to find that a private company was acting under the direction of a federal officer, delegation of specific government tasks meets the "acting under" prong. *See generally id.*

The Sixth Circuit examined the "acting under" prong in its opinion in *Bennett v. MIS Corp.* In *Bennett*, the FAA discovered mold, including toxic mold, in one of its control towers and contracted with MIS, a private corporation, to treat and remove the mold. *See Bennett,* 607 F.3d at 1082-83. After completion of the mold removal project, Bennett filed suit against MIS in state court for negligent execution of its mold remediation contract. MIS removed the case to the Eastern District of Michigan under the Federal Officer Removal Statute. *See. id.* at 1083-84.

In its removal motion, MIS alleged that it was acting under the direction of a federal officer because "'its work was performed at the direction of, and in accordance with, [ ] detailed mold abatement specifications established by the FAA' and that '[t]he FAA provided detailed [instructions] . . .  pertaining to the materials that MIS was required to use and the manner in which

5

MIS was to perform the [mold] remedial activities.'" *Id.* at 1087. MIS attached the contract to its removal motion. The Sixth Circuit, in its review of the contract,[4] found that the FAA contractually required MIS to "follow explicit parameters for site containment and waste disposal," *id.*, and that the FAA closely monitored MIS's work. The Court determined that the contract required an "FAA contracting officer" to be on-site and that the officer: (1) could not modify contract procedures without approval, (2) could dismiss incompetent MIS employees, (3) could control MIS employee working hours, (4) must escort MIS employees at all times, and (5) could prohibit entry into the site. *See id.* at 1087-88. This, the Sixth Circuit determined, "went beyond simple compliance with the law," and therefore was "a job that, in the absence of a contract with [MIS] [or another private mold remediation firm] the [FAA] itself would have had to perform." *Id.* at 1088 (distinguishing the facts of *Bennett* from those in *Watson*) (internal quotations omitted).

In the present cases, McKesson argues that it acted under the direction of a federal officer because absent the PPV Contract, the VA would have to warehouse and distribute drugs itself, a model it previously abandoned. In this way, McKesson argues, it helps the VA (and IHS) carry out their duties of providing prescription drugs to the Cherokee Nation and the Lac Courte Oreilles Band of Lake Superior Chippewa Indians. McKesson argues it has an unusually close relationship with the government due to monitoring and oversight of the PPV Contract by a Contracting Officer. Like MIS, McKesson performs a function that the VA would otherwise have to do itself (and in fact did do prior to instituting the PPV program).

McKesson cites sections I-1(a), (f)-(i), I-9, and I-18(i) of the PPV Contract for the proposition that the "contract is heavily regulated, monitored, and supervised" and states that it

---

[4] "When a district court's subject matter jurisdiction is in question, it is empowered to review extra-complaint evidence and resolve factual disputes." *Bennett*, 607 F.3d at n.11 (citing *Rogers v. Stratton Indus. Inc.*, 798 F.2d 913, 915–16 (6th Cir.1986).

"cannot act (i.e. distribute) without the direction of the VA." (1:18-OP-45695 Doc #: 29 at 13)
These sections specifically require McKesson to "maintain an adequate supply and distribute all
drug/pharmaceutical . . . items and other contracted items," "provide [all items ordered] to the
ordering facilities in accordance with the terms and conditions of the PPV contract," and "[u]pon
request . . . coordinate large and bulk orders [of pharmaceuticals]." (1:18-OP-45695 Doc #: 29-3
at 13) (hereafter cited as "PPV Contract") These sections describe how McKesson is required to
perform actions that the VA used to have to do itself, but do not on their face demonstrate the level
of supervision and involvement the FAA had over MIS's actions in *Bennett*. For this, McKesson
cites section I-18(i), which provides that "[t]he Government will witness products received at the
loading docks (or specified delivery location) and sign delivery receipt documents before the PPV
driver departs." (*Id.* at 40) This falls short of the level of supervision the FAA had over MIS in
*Bennett*, however, there are factual differences between the contractual obligations of MIS in
*Bennett* and those of McKesson here. In the present cases, McKesson does not need to fill
pharmaceutical orders under the close scrutiny of the VA contracting officer because the PPV
Contract provides recourse in the event the government is not satisfied with an order. (*See, e.g.*,
*Id.* at 72) Additionally, although not based on McKesson's actions under the PPV Contract, there
is evidence that McKesson's actions are heavily monitored and regulated. In January, 2017, the
government imposed a $150 million fine on McKesson for, among other things, failing to "design
and implement an effective system to detect and report 'suspicious orders' for controlled
substances" in violation of the Comprehensive Drug Abuse Prevention and Control Act. (1:18-
OP-45932 Doc #: 15-1 at 1)

The Tribes contend that the PPV Contract is insufficient to support federal officer removal.
Cherokee cites *Creighton v. Fleetwood Enterprises, Inc*., No. CIV.A. 07-7194, 2009 WL 1229793,

7

at *7 (E.D. La. May 5, 2009); *Joseph v. Fluor Corp.*, 513 F. Supp. 2d 664, 673 (E.D. La. 2007);

and *Ohio ex rel. Rogers v. Sherwin-Williams Co.*, No. 2:08-CV-00079, 2008 WL 4279579, at *4

(S.D. Ohio Sept. 17, 2008) to support this assertion. Similarly, Lac Courte Oreilles cites *Brokaw

v. Boeing Co.*, 137 F. Supp. 3d 1082 (N.D. Ill. 2015), *Custer v. Cerro Flow Prods.*, No. 09-514-

DRH, 2009 WL 5033931 (S.D. Ill. 2009), and *Gragg v. Alfa Laval, Inc.*, Civil No. 09-773-GPM,

2009 WL 4110389 (S.D. Ill. 2009). These cases are distinguishable from the present case.

### 1.     Cases Cited by the Tribes are Distinguishable

In *Creighton*, plaintiff alleged that defendant negligently inspected plaintiff's FEMA

supplied trailer, which subsequently exploded causing injury. Defendant removed the case to

federal court under the Federal Officer Removal Statute citing the presence of a government

contract to show that it was acting under the direction of a federal officer. The court disagreed,

stating:

> The contract's Performance Work Statement specifies at the outset that it
> "establishes the minimum requirements for disaster area maintenance of temporary
> housing units." FEMA assumed authority over certain narrow areas, but there is no
> indication that FEMA intended to retain general responsibility for the details of
> implementation. To the contrary, the contract establishes a specific procedure
> through which FEMA's representative could issue written directives supplementing
> and clarifying the general contract provisions. The implication of this provision is
> that ARS was solely responsible for determining how to execute the contract in the
> absence of written directions. In addition, the contract contemplates that ARS
> would be "responsible for errors and omissions committed by it," except to the
> extent that FEMA caused or contributed to ARS's liability. All of these provisions
> suggest that, as a general matter, the parties intended for ARS to exercise discretion
> and independent judgment in the performance of its duties.

*Creighton,* 2009 WL 1229793, at *4 (internal citations omitted).

In *Creighton*, the defendant identified several contract provisions to demonstrate

government control. The contract required them to set up and operate a toll-free maintenance

number for trailer occupants and to obtain permission from FEMA before replacing any part worth

more than $250. The court pointed out, however, that few of the "provisions [cited by defendant

to show government control] have any connection to [defendant's] allegedly tortious conduct." *Id.* at *5.

In the present case, McKesson was not given the level of broad discretion and independent judgment given to the defendants in *Creighton*. The tortious conduct in Creighton was negligent training and inspection of FEMA trailers, and the court found that the defendant in that case could not point to contract provisions that mandated how they train their personnel or inspect trailers. Instead, the court found the FEMA contract set minimum standards, and the defendant was permitted to meet those minimums at its discretion. Here, McKesson's allegedly tortious conduct is negligent distribution of opioids (i.e. diversion), and the PPV Contract deals specifically with how McKesson must distribute pharmaceuticals. (*See, e.g.*, PPV Contract at 13) ("All items ordered *shall* be provided to the ordering facilities *in accordance with the terms and conditions* of the PPV contract.") (emphasis added)

In *Joseph v. Fluor Corp.* (another case from the Eastern District of Louisiana involving FEMA trailers) the court determined that the contract for the FEMA trailers merely set "minimum standards for travel trailer construction and outfitting" and that "[t]he standards shall not be considered restrictive in that the supplier may provide "equal or better" units considering that the competitive price and delivery requirements can be met." *Joseph v. Fluor Corp.*, 513 F. Supp. 2d at 672 (quoting specific contract provisions). In the case at hand, McKesson is supplying pharmaceuticals pursuant to strict contractual requirements in a highly regulated industry.

*Ohio ex rel. Rogers*, in addition to being the only case cited from the Sixth Circuit, is easily distinguishable. In *Ohio ex rel. Rogers*, the court found that defendant seeking removal "was unable to establish a direct contractual relationship with the federal government and therefore failed to establish the special relationship with the federal government required to fulfill the 'acting

under' requirement." *Ohio ex rel. Rogers*, 2008 WL 4279579, at *2. In this case, it is uncontested that McKesson has a contractual relationship with the government.

Cherokee also identifies the recent Sixth Circuit decision in *Mays v. City of Flint, Mich.*, 871 F.3d 437 (6th Cir. 2017) for the proposition that a private contractor is not "acting under" the direction of a federal officer when, for example, a government contract allows for the contractor's discretion to act pursuant to that contract. Here, Cherokee argues, McKesson had discretion to "investigate suspicious opioid orders, refuse to fill them, and make reports for further investigation." (1:18-OP-45695 Doc #: 36 at 7) In other words, Cherokee argues that McKesson could choose not to fill orders at its discretion. This is not entirely accurate.

Although the PPV Contract does state that "The Contractor is not required to fill an FSS[5] order (or that portion of an order) that investigational facts suggest will be diverted into the commercial market or will otherwise be diverted from usage by authorized FSS ordering activities," (PPV Contract at 80), it goes on to state "However, the Contractor may not unreasonably delay filling an FSS order, pending its investigation of the intended use of the items ordered." (*Id.*) Further, the PPV Contract goes on to provide a procedure for the Contracting Officer ("CO") to review any such decisions made by the PPV Contractor, and also provides that "the CO may instruct the Contractor to fill an executive-agency-level order and/or resume acceptance of executive agency indirect orders." (*Id.*) The PPV Contract further provides that "No authorized FSS ordering activity may be suspended from eligibility under the Schedule by any Contractor, except on the written instruction of the Schedule CO." (*Id.*) The implication of these contract provisions is that although there is some limited discretion to conduct an investigation

---

[5] Federal Supply Schedule

10

into potential diversion, McKesson ultimately had little discretion whether to fill an order, and could not unilaterally choose to not fill a government order or otherwise suspend an FSS.

*Mays* is distinguishable for similar reasons to those in *Ohio ex rel. Rogers*. In *Mays*, the Michigan Department of Environmental Quality ("MDEQ") was the primary enforcement authority over the Safe Drinking Water Act ("SDWA"). The MDEQ, a state agency, claimed that absent its primary enforcement authority over the SDWA, the EPA, a federal agency, would have to enforce the SDWA itself. *Mays*, 871 F.3d at 444.  The Court acknowledged that MDEQ received funds from EPA, but found that alone was insufficient to establish a delegation of legal authority that would give rise to a state agency's ability to invoke the Federal Officer Removal Statute. *Id.* at 444-45. In effect, the Sixth Circuit was indicating that MDEQ was not a government contractor.

The Sixth Circuit noted that "a government contractor entitled to removal would presumably be contractually required to follow the federal government's specifications in making products or providing services." *Id.* at 445. The Sixth Circuit agreed with the district court's conclusion that MDEQ had shown "no contract, no employer/employee relationship, nor any other indication of a principal/agent arrangement between the MDEQ and the EPA," *id.* at 444, and concluded that "the receipt of federal funding alone cannot establish a delegation of legal authority because finding such a delegation on that basis is way beyond the reasoning of *Watson* and would allow myriad state agencies to invoke federal-officer removal." *Id.* at 444-45. Thus, the court concluded "the state retain[ed] the freedom to enforce its own safe-drinking-water laws and regulations," and was not "acting under" the EPA for the purpose of invoking the Federal Officer Removal Statute. In the present case, McKesson inarguably has a contractual relationship with the government and has retained little, if any, freedom to decide whether to fill orders pursuant to the PPV Contract.

11

In *Brokaw*, defendants were moving military cargo pursuant to a contract with the U.S. Government when some of the cargo broke loose from its holds, penetrated a pressure bulkhead of the Boeing 747 that was transporting it, and caused the plane to crash. *Brokaw*, 137 F. Supp. 3d at 1088. Defendants removed the case under the Federal Officer Removal Statute stating that they were "'carrying out duties pursuant to a contract with the United States Government,' and because 'the military was directly involved in loading the aircraft and controlled the details of the cargo transport operation, including, but not limited to, the type and quantity of military cargo being transported, and the starting point and final destination for such cargo deliveries.'" *Id.* at 1097 (quoting defendants' response brief). The court determined that removal was not proper because "[a]lthough [the defendant] was performing (at least indirectly) under a defense contract and was flying in a military zone, at bottom it was engaged in the simple act of moving cargo. *Id.* The court found that the defendant "had significant discretion in deciding how to perform its duties under the contract," *id.*, and cited the contract as providing that "Multiple modes (i.e. airlift, sealift, linehaul) of transportation may be used to move cargo to/from multiple zones globally."

*Brokaw* is distinguishable based on the contractual obligations and the amount of discretion given to the government contractor to fulfil those obligations. In *Brokaw*, the action at issue pursuant to the contract was the transportation of the equipment. The military wanted its equipment moved from point A to point B, and provided the defendant a lot of discretion on how to do that. Here, the action at issue pursuant to the contract is not the transportation of the drugs, but the filling of specific orders received from its government customers. In that regard, McKesson, as discussed below, did not have the discretion, under the contract, to unilaterally refuse to fill orders based on its concerns about potential diversion, nor could it ship pharmaceuticals that were not actually ordered.

*Custer*, like the other cases discussed, is distinguishable due to the amount of discretion given to the defendants in that case. *Custer* involved a suit for liability over the release of hazardous substances at three sites. *Custer*, 2009 WL 5033931, at *1. The defendants removed the case under the Federal Officer Removal Statute alleging they were acting under the direction of a federal officer because they were contractually obligated to produce chemicals, including Agent Orange and polychlorinated biphenyls ("PCBs"), for the government. *Id.* at *2. The court stated that:

> Defendants argue that the government contracts required them to dispose of wastes in a fashion required by the government. However, Defendants have not pointed to any government requirement that prevented them from handling and disposing of the PCBs with care. While they argue that the CWS contracts required them to dispose of materials in a certain fashion, they have pointed to no such requirement or mandated specifications as to disposal.

*Id.* at *4. The defendants in *Custer* had discretion regarding how they disposed of the PCBs, or at least were not directed to be careless. Here again, McKesson's discretion, with respect to their performance under the PPV Contract, is limited. When the government submits an order under the contract, McKesson is obligated to fill the order. Further, as discussed above, McKesson has only limited ability to refuse, and even when they refuse to fill an order, that decision is ultimately at the discretion of the federal contracting officer. (*See* PPV Contract at 80)

*Gragg* is inapplicable. In *Gragg* the court decided to remand the case to state court because, in the court's opinion, the defendant had failed to "put forward sufficient evidence even to raise an inference of a colorable federal defense." *Gragg*, 2009 WL 4110389, at *4. Despite this, Lac Courte Oreilles cites a passage that again illustrates an important distinction in the level of discretion Foster Wheeler had in designing its warnings in *Gragg*, versus the discretion McKesson has in refusing to fill orders here. Lac Courte Oreilles identifies that the court in *Gragg* found that "even assuming . . . the [United States Navy] exercised the final control over the content of the warnings that accompanied the equipment supplied to it by Foster Wheeler, this does not negative

13

the possibility that Foster Wheeler had responsibility for designing the warnings, in whole or in part." *Id.* This presumed degree of control exercised by Foster Wheeler was evidence cited by the court to reject Federal Officer Removal.

### 2. The PPV Contract Required McKesson to Distribute Opioids Pursuant to Its Terms

The Tribes argue that McKesson could not have been acting under the direction of a federal officer because McKesson was in breach of its contractual obligations not to divert opioids. This argument is faulty for two reasons. First, it rests upon the conclusion that McKesson was in fact allowing the diversion of opioids in violation of the PPV Contract, which is merely an allegation and remains unproven until trial. Second, it confuses the analyses of the "acting under" and "causal nexus" prongs.

The Tribes argue that the PPV Contract did not *require* McKesson to engage in opioid diversion, and in fact specifically forbade it. This is of course, true. The government did not direct McKesson to engage in opioid diversion. The government did, however, direct McKesson to distribute pharmaceuticals pursuant to the PPV Contract. The Tribes allege that McKesson filled suspicious orders in violation of the PPV Contract's express mandates to comply with state and federal laws. According to the Tribes, if the PPV Contract forms the basis for McKesson's argument that it was acting under the direction of a federal officer, and McKesson was in violation of that contract, then McKesson could not have been acting under the direction of a federal officer. This argument relies, however, on the conclusion that McKesson was engaged in opioid diversion in breach of the PPV Contract. The "acting under" prong, however, is not concerned with the specific actions actually taken by McKesson, but rather asks whether McKesson was directed by a federal officer, pursuant to a legal obligation, to perform a task that otherwise the government

would be required to do. In other word, the "acting under" prong merely examines the relationship between the defendant and the federal government.

The Tribes' assertions that McKesson's actions allowed opioid diversion to occur in breach of the PPV Contract implicates the "causal nexus" prong. Diversion of opioids either occurred or did not occur as a direct result of McKesson's obligation to fill orders under the PPV Contract. The "causal nexus" prong, analyzed further below, examines McKesson's actions taken pursuant to the PPV Contract. The analysis examines whether there is a connection between those actions and the opioid diversion that forms the basis of Cherokee complaint. The Tribes' assertions that McKesson filled orders that it knew or should have known would be diverted highlights the connection between McKesson's actions (filling and distributing opioid orders) and the Tribes' claims (diversion). This is a "causal nexus" argument. It is not an argument that McKesson was not acting under the direction of a federal officer.

The issue for the "acting under" prong is whether McKesson's relationship with the government was sufficiently close to warrant a federal forum. As described above, in *Bennett*, the Sixth Circuit found that MIS was acting under the direction of a federal officer. The Court determined that the contracts in that case included 1) precise specifications, *see Bennett*, 607 F.3d at 1087, 2) close monitoring of MIS's work by federal officers, *see id.*, and 3) "MIS help[ing] FAA officers carry out their task of ridding a federal employee occupied building of an allegedly hazardous contaminant—'a job that, in the absence of a contract with [MIS] [or another private mold remediation firm] the [FAA] itself would have had to perform.'" *Id.* at 1088 (quoting *Watson*, 551 U.S. at 153). Here, first of all, McKesson was subject to the precise specifications of the PPV Contract with regard to quality and ordering, (*see* PPV Contract at 11) Secondly, the administration of the PPV Contract was overseen by a federal government contracting officer who had final say

15

over whether McKesson could choose not to fill an order. *See Id.* at § AS3023. And finally, absent McKesson's distribution pursuant to the PPV Contract, the VA would have to warehouse and distribute drugs itself, a job it formerly did but abandoned in favor of the PPV Program.

Although the level of supervision falls short of the specific factual circumstances present in *Bennett*, the Sixth Circuit determined that the test when analyzing "whether a private firm is 'help [ing]' or 'assist[ing]' a federal officer, such that its assistance satisfies the 'acting under' requirement [is whether] . . . '[t]he assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'" *Bennett*, 607 F.3d at 1086 (quoting *Watson*, 551 U.S. at 153-54). This is undoubtedly a close call, but under the specific factual circumstances of these cases and the liberal construction of the Federal Officer Removal Statute mandated by the Supreme Court, the Court finds that the assistance McKesson provides to the VA goes beyond simple compliance and helps the government perform basic tasks. Therefore, McKesson was acting under the direction of a federal officer for the purposes of the Federal Officer Removal Statute.

### B.    Causal Nexus

The second prong requires the party seeking removal to show that the actions for which it is being sued were performed under the color of federal office. "To satisfy th[is] requirement, [McKesson] must show a nexus, a 'causal connection' between the charged conduct and [the] asserted official authority." *Bennett*, 607 F.3d at 1088 (quoting *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999)). That is, there must be some causal nexus between the plaintiff's claims and the private party's actions committed under the direction of the federal government. *See Watson*, 551 U.S. at 148. "The hurdle erected by this requirement is quite low." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (citing *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926)).

The Tribes argue that there is no causal nexus between their assertions that McKesson engaged in opioid diversion and the actions McKesson performed under the contract, or at least that McKesson should be estopped from making the argument that there is a causal nexus because of arguments McKesson made in contesting tribal court jurisdiction. The Tribes also argue that McKesson's distribution to the VA and IHS (i.e. the distribution that occurred pursuant to the PPV Contract) are not at issue because they did not specifically allege that any of the diverted opioids came from tribal healthcare facilities. However, the Tribes' claims put *all* prescription opioids at issue and allege that diversion can occur at *any* point in the supply chain, including those opioids supplied pursuant to the PPV contract. The issue here is whether McKesson's drug distribution was performed pursuant to a federal contract, and in this case it was.

The causal nexus relationship required for federal officer removal depends on whether the actions of the defendant under the direction of a federal officer are causally linked to the claims the plaintiff is making. Here, the Tribes are claiming that McKesson engaged in opioid diversion, and further assert that opioid diversion occurs "when distributors fill suspicious orders of opioids from retailers or prescribers." (1:18-OP-45695 Doc #: 2-1 at 9-10), *see also* (1:18-OP-45932 Doc #: 1-1 at 40) Thus, there is a causal nexus between McKesson's action under the direction of a federal officer (filling orders pursuant to the PPV contract) and Cherokee's claim of opioid diversion (that McKesson knew or should have known that the orders were suspicious and should not have filled them).

McKesson should only be estopped from making its nexus argument if the "issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982).

The test for tribal court jurisdiction requires a consensual relationship between the tribe and the tribal court defendant, and then asks whether the litigation arose from that relationship. *See generally, Montana v. United States*, 450 U.S. 544, 565 (1981). The test for causal nexus under the Federal Officer Removal Statute on the other hand requires the actions performed under direction of a federal officer be causally linked to the plaintiff's claims. The precise issue of whether there is a causal link between McKesson and either Tribes' asserted claims (i.e. the issue of federal subject matter jurisdiction under the Federal Officer Removal Statute) is different from whether or not there was a consensual relationship between McKesson and the Cherokee Nation, and whether Cherokee's suit against McKesson arose from that relationship (i.e. the issue of tribal court jurisdiction over non-tribal parties). McKesson should not be estopped from arguing that there is a causal nexus.

### C.      Colorable Federal Defenses

The final prong requires that the party seeking removal must assert a colorable federal defense. This prong also erects a low bar and merely requires that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. California*, 489 U.S. 121, 129-30 (1989). For example, the Sixth Circuit has stated that "a colorable federal defense need only be plausible, and that a district court is not required to determine its validity at the time of removal." *Bennett*, 607 F.3d at 1089 (citing *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 391 (6th Cir. 2007)) (internal citation omitted). In *Bennett*, the Sixth Circuit specifically addressed whether the government contractor defense was available to non-military service contractors and found that it was. *See Id.* at 1091.

McKesson asserts that it has colorable federal defenses, including the government contractor defense. Cherokee asserts that McKesson does not have a colorable federal defense in its Motion to Remand, but does not readdress the issue in its reply brief. This is likely because the

"colorable federal defense" prong has been determined to erect a relatively low bar. *See Bennett*, 607 F.3d at 1089 ("we have stated that a colorable federal defense need only be plausible, and that a district court is not required to determine its validity at the time of removal"). The Sixth Circuit goes on to explain that "it is at least plausible that the government contractor defense could apply outside the military procurement contract context." *Id.* at 1090.

The government contractor defense applies when: "(a) the United States approved reasonably precise specifications; (b) the equipment conformed to those specifications; and (c) the supplier warned the United States about dangers in the use of the equipment known to the supplier but not to the United States." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 501 (1988). The Court need not determine whether McKesson meets the requirements set forth in *Boyle* only that it is plausible that they could.

Here, it is plausible that the PPV Contract shows that the United States approved reasonably precise specifications and that McKesson's deliveries conformed to those specifications. Regarding the third "warning" prong of *Boyle*, McKesson can plausibly argue that it was aware of no greater danger than the government was already aware of. Therefore, McKesson's distributions to the federal government pursuant to the PPV Contract are sufficient to demonstrate that the government contractor defense is plausible. Because the "colorable federal defenses" prong is a low bar, McKesson's arguments that it is asserting colorable federal defenses for the purpose of federal officer removal are well taken. McKesson has asserted at least one colorable federal defenses sufficient to meet the third prong of the federal officer removal analysis.

### D.   The Policy Implications of Denying the Tribes' Motions

Cherokee argues that if the Court were to deny its motion to remand, that it would set a precedent that would allow McKesson to use the Federal Officer Removal Statute to remove cases brought by the States in state court to federal court despite this Court's previous statements that it

does not have jurisdiction over State Attorneys General who bring state based claims in state court. However, to date McKesson has not removed or attempted to remove any cases brought by a State Attorney General on behalf of his or her State on the basis of the Federal Officer Removal Statute. Furthermore, while McKesson initially removed the case brought by the Commonwealth of Kentucky, McKesson subsequently consented to the remand of that case back to state court.[6]

The court recognizes that this is a close case and construes McKesson's removal arguments very narrowly as applicable only to the specific facts of these two cases. The Court is persuaded by the Supreme Court's mandate to give the Federal Officer Removal Statue a liberal interpretation and also swayed by the fact that all of the other Native American Tribe cases have been removed to federal court and transferred to the Opioid Crisis MDL, or were filed directly in federal court. As of August 31, 2018, there are 51 Indian Tribe lawsuits consolidated in the MDL, and besides Cherokee and Lac Courte Oreilles, no other tribes have filed remand motions, and if they did, the tribe subsequently withdrew its motion. The Court believes this is in part due to recognition on the part of the tribes that it is in their individual and collective best interest to be part of the MDL.

## IV.     Conclusion

Accordingly, the Motions to Remand filed by plaintiffs Cherokee Nation and Lac Courte Oreilles Band of Lake Superior Chippewa Indians (1:18-OP-45695 Doc #: 12; 1:18-OP-45932 Doc #: 15) are hereby **DENIED**.

On July 26, 2018 McKesson filed a Motion for an Order Directing the Clerk of the Court to Stay Execution of Any Remand Order for 14 Days Pursuant to Fed. R. Civ. P. 62(a). Because the Court has denied Cherokee's Remand Motion for the preceding reasons, McKesson's Motion to Stay Execution of Any Remand Order is **DENIED** as moot.

---

[6] *Commonwealth of Kentucky, ex rel. Andy Beshear Attorney General v. McKesson Corporation*, Case No. 1:18-op-45682 (E.D. Ky.) was removed under federal question jurisdiction.

On August 9, 2018 Cherokee filed a Motion for Oral Argument on its Motion for Remand. The Court has discretion regarding whether to grant oral arguments, and in this case the Court feels that the parties' positions were adequately briefed and that no oral argument will be necessary for the Court to make a determination. Therefore, Cherokees' Motion for Oral Argument is **DENIED**.

The Tribes also move for an award of costs and fees. Because the Court finds it does have subject matter jurisdiction over the Tribes' cases, Cherokee's and Lac Courte Oreilles' motions for costs and fees are also **DENIED**.

**IT IS SO ORDERED.**


_/s/Dan Aaron Polster  9/4/2018_
**Dan Aaron Polster**
**United States District Judge**